N. C. Hacker v. N. C. Cain N. C. C. Hacker v. N. C. C. C. C. Hacker v. N. C. C. C. C. C. C. First, Mr. Hacker was disabled under the ADA under two different definitions. First, he was substantially limited in several major life activities, given the very permissive way that that is defined under the ADA after it was revised in 2008. And second of all, he also had a record of disability under the ADA, as established by many of the defendant's own doctors and own medical records. Second, Mr. Hacker's disability was not accommodated. The prison did virtually nothing to accommodate Mr. Hacker's disability, as it did virtually nothing for any of its blind inmates. Lastly, Mr. Hacker clearly exhausted his claim as a matter of law under the Prison Litigation Reform Act. Unless there are initial questions, I'll begin with the evidence of Mr. Hacker's actual disability. So there's a large amount of evidence in his medical records going from 2011 to 2014 that established that he was substantially limited in the ability to see, as well as having limitations in several other major life activities. In 2008, Congress amended the ADA specifically to overrule several Supreme Court cases that interpreted disability narrowly. Congress was clear, and it lists this in the purpose of the statute, that the Supreme Court had made a mistake by using the definition of disability too narrowly to serve as too much of a gatekeeper to keep out disability claims, and that the severity of disability should be going to reasonable accommodation, not to the question of whether someone was disabled at all. And this is even explained in further detail in the Department of Justice's implementing regulations of Title II of the ADA, which the Supreme Court has held are entitled to deference in its 1999 case, Olmstead. The implementing regulations from DOJ state that the question of disability should not even require extensive analysis, and that the two terms of art, substantial limitation and major life activity, are both to be read very broadly. The uncontested medical record evidence in this case clearly, as a matter of law, go above that very low standard. Mr. Hacker was seen repeatedly by different doctors inside Angola, outside Angola, by optometrists, by ophthalmologists, by outside hospitals. He was referred for surgery many times, and all of this evidence is sufficient to establish a violation, or pardon me, to establish a disability under the ADA. In addition to the objective medical record evidence, he also testified as to substantial limitations on his major life activities. So did two other witnesses, and so did an expert witness, harmonizing the testimony from Mr. Hacker and the medical record evidence, demonstrating how his inability to see provided several limitations on major life activities, including seeing, but also things like walking, things like working. As one example of evidence that just went entirely unrebutted, Mr. Hacker testified that he had substantial limitations in his ability to walk, to navigate Angola. Angola's own deputy warden testified that Angola had an informal system where blind inmates were led around by other inmates, as opposed to being given a cane or some other mobility device. He testified that he struggled. Mr. Hacker testified that he struggled to navigate Angola in that environment. So did the two other witnesses. Defendants simply never addressed that evidence at all. So just the evidence of walking alone, that's one major life activity. The DOJ implementing regulations explicitly state that disproving limitations on one major life activity doesn't mean that someone is not disabled if they have limitations on another major life activity. So his diagnosis with the cataracts was in 2012, right? Yes, sir. And the surgery was like in 2014? Yes. So in that time period, was his activities, I mean the prison activities, the requirements, is that the time frame you're principally speaking of before the surgery? Absolutely, Your Honor. Yes, there's actually an order in lemonade about his vision after the surgery. He was given surgery something like two years and three months after he was first diagnosed with cataracts, which followed a long diagnosis process, and he was given surgery about a month after he obtained counsel in this case, in one eye and then a couple months later in the other. So did the surgery follow the filing of the lawsuit or the lawsuit? It filed not only the filing of the lawsuit, but he initially filed pro se, and after he obtained counsel in this case, then he was given surgery in one eye and then the other, which, of course, moots his injunctive claim because it's uncontested that he had cataracts, that he needed cataract surgery, and that he received cataract surgery and now can see well. In fact, there was an order in lemonade in this case that his current effective vision was not relevant to whether he had a disability in 2012, 2014, although that was nonetheless discussed extensively at trial, which we cite in our brief. So in addition to whether Mr. Hacker had an actual disability, he at the very least had a record of disability as a matter of law. Again, defendants' own medical records established time and time again that he needed surgery. They described him as legally blind in 2013 when he filed the grievance to exhaust this case. The deputy warden for health services responded and said, I've done a careful review of all your medical records, and while I do believe that you are, quote, legally blind, I'm nonetheless not going to give you relief in this case. So all of that, the ADA has established this other way of getting to disability, in large part to not relitigate these issues of whether a diagnosis is actually genuine. Here, of course, it's made by defendants' own doctors and defendants' own staff repeatedly. So even if it was not clearly established as a matter of law that he was disabled, and we think that it was, he unquestionably had a record of disability,  So did the characterization or the denotation of legal blindness, did that opinion or determination carry extra or import insofar as the ADA claim? In other words, you argued that even defendants determined he was, quote, legally blind. So I'm just asking, is the determination of legal blindness, does that carry additional weight? Does it reinforce the claim? Is it just a part of all the variables that fit into it or nothing? Absolutely, Your Honor. I think that it carries a significant amount of weight because I think it would be impossible to argue with the fact that there is a large gap between legal blindness and the sort of vision impairment that would create a disability under the ADA because, again, to turn to the DOJ implementing regulations, they say a substantial impairment is just not being able to do something as well as most of the general population. And a major life activity in 2008 when Congress was broadening the definition of disability, they listed seeing explicitly as a major life activity. So the question here is whether, in addition to the other several major life activities we described, whether he could see worse than a majority of the general population. And if he was legally blind, it's obvious that he could see worse than the majority of the general population. So in that way, there's a large gap, and defendants discussed a lot about this one page of one medical record that suggests only on the issue of visual acuity, perhaps Mr. Hacker was not legally blind. But the question of disability is much narrower. So turning to the issue of record of disability, if a record, and not just one, but many records establish that he was legally blind and that he needed surgery, that is a much higher bar than whether he was disabled under the ADA, given such a permissive definition. So in addition to Mr. Hacker not being, in addition to Mr. Hacker being disabled under the ADA, he was also not reasonably accommodated. And the jury didn't reach that issue. Correct, Your Honor. So essentially, he filed an emergency letter and a grievance to the prison about his eyesight. Of course, the prison already knew about his eyesight because his defendants were doing this extensive testing starting in 2011. In fact, the majority of defendants' defense was that they did all this testing for Mr. Hacker in 2011 and 2012. That was their defense to his Eighth Amendment claim, which we have not appealed. So by 2013, when he filed this letter, they knew all about his eyesight problems, and the deputy warden, Warden Peabody, testified at trial that if our doctors know something, then the prison knows something for ADA purposes.  And the deputy warden testified as the official representative of the Department of Corrections. So when he filed this grievance saying that he was working in the fields using sharp equipment, and also as he testified without rebuttal, they put a guy with a gun on one side of him and a guy on a gun with the other side of him, and if you cross that line, the first shot goes in the air and the second shot goes at you. As Mr. Hacker testified and plaintiff's expert testified, that is a really dangerous place for somebody with seriously impaired vision. So he requested to be taken out of the fields, and in response, they took him out of the fields for several days and then put him right back. Of course, not because his eyesight improved, but they essentially gave him several days of a reasonable accommodation, but then to his permanent problem, they only gave him this very temporary solution and then put him right back. And eventually, they moved him to a machine shop, which was also a very dangerous work environment. Mr. Hacker testified to that. So did plaintiff's expert, Bell, and so did the representative for defendants. Deputy warden Peabody testified that the machine shop was no place for somebody with low vision. And they didn't accommodate him in other respects either. So this informal system of having inmates lead one another around when they're legally blind is not a safe environment, as Mr. Hacker testified to and as plaintiff's expert testified to. He was not given a cane. He was not given any other sort of accommodation. And to be clear, because Mr. Hacker raised a failure to accommodate claim, there was no independent need to prove discrimination under the ADA because the law of the ADA is that when you bring a failure to accommodate claim, the failure to accommodate claim is itself discrimination. And the judge got that one right, and in our reply brief, we cite the jury instruction, which correctly described the law on that issue. Just to briefly discuss exhaustion, Mr. Hacker clearly exhausted his grievance. He literally used the word disability. He described his inability to see in great detail. Under this court's case in Johnson v. Johnson, it's very clear that inmates have to grieve facts to put defendants on notice. They don't have to grieve legal theories. And, of course, that's obvious given that these are uncounseled, incarcerated people. They need to put defendants on notice of their problem to attempt to resolve it before filing a lawsuit. They don't need to cite the individual cause of action. So under this court's case in Johnson v. Johnson, he obviously exhausted. In fact, exhaustion is an affirmative defense. Defendants did not mention exhaustion. They put on no evidence of exhaustion that he failed to exhaust whatsoever. And yet when plaintiffs filed a Rule 50 motion, the court denied it, saying that there were questions of fact. There was not conceivably any question of fact. It was uncontested that he had gone through the grievance process. The only question was whether his grievance was legally sufficient. Let me ask you a question. Over time, I would generally view a case like this being up here in front of us on a summary judgment. And the argument would be there are genuine issues of material fact. You know, we didn't need a trial, et cetera, et cetera. I found it interesting here. It's not that this guy started off per se. He got counsel, et cetera. He managed to get a jury trial, not up on summary judgment. So the question is, you know, this was fully tried, at least on the disability claim, in front of a jury. You know, with all the evidence, so what's your most compelling argument as you sit down? You know our law in terms of reversing jury verdicts. So I'm saying what's your most compelling argument that even if we thought, you know, jury could have seen this, jury could have seen that, but, you know, it's reversible jury error. You understand what I'm saying? I do understand, and I think that that's an important question. Just two things I would briefly mention before I sit down for now is, first, there were several violations of orders in limine of prejudicial information. It made up a large part of the defendant's opening statement as well as a large part of their defense. So a significant amount of the case against Mr. Hacker in front of this trial was not actually on the law of the ADA, but on whether his disability was temporary, which has not been the law of the ADA for 10 years, and all these other issues. So we don't think Mr. Hacker got an entirely fair trial, which is why we bring those limine claims. And in that way, the two big claims that we're bringing in front of you do reinforce one another in a sense that the violations of the orders in limine were so prejudicial because there was such a lack of evidence on the actual legal claim, and in turn, the orders in limine helped to explain why the jury reached the berth that it did. All right. And second, just very briefly, I would say on page 25 of our reply brief, we cite a couple of cases that Johnson v. Thibodeau City and Carly, which were just the few months prior to when we filed our reply brief where this court did overturn jury verdicts. And so we know that it's a presidential standard, but when the district court misunderstands the appropriate legal standard and there is simply not evidence supporting that verdict, this court also will not hesitate to overturn it. All right. Thank you, sir. You have preserved your rebuttal time. All right. Mr. Blanchfield. Thank you. Good morning, Your Honors. It's an honor to be here. May it please the court. You know, this matter was tried to a jury, and the jury did not believe Mr. Hacker. They did not think he was disabled. They didn't think his vision was nearly as bad as he attempted to convince them it was. And they made that finding. And as this court is well aware, the trial judge in the post-verdict 50B motion was posed the question, you know, looking at everything in the light most favorable to the defendants, was there any evidence to support the finding that this guy was not disabled, did not have a qualifying disability? And the answer is clearly there's plenty of evidence. At the trial, the jury was fully charged on the ADA qualifying disability. Definition of a disability is a physical or mental impairment that substantially limits one or more major life activities. They were specifically told about temporary disabilities. It is an impairment that is temporary as a disability if it limits a major life activity when it is active. Those were the jury charges. The plaintiffs had no objection to those jury charges. They had no objections to the verdict sheet, and the sole answer on the ADA claim to interrogatory number one, which was their interrogatory, said, you know what, he didn't prove his case. He didn't prove he was disabled. He didn't prove his vision was nearly that bad. And Judge DiGravo, in making his post-trial ruling, he says it better than I can say it, and I'm going to quote a passage from it. He said, there's testimony at trial that much of the medical testing that Plaintiff underwent, the records substantiating his disability, and the recommendations made about his treatment were based primarily on his own self-reports. Additionally, Dr. Castle testified Plaintiff's medical records just prior to his surgery showed that his visual acuity was significantly better than the prison records suggested, and I'm going to add, more importantly, much better than Mr. Hacker led on to to this jury, because we knew that right before his surgery his vision was 2060 and 2100. Pretty good vision. And the judge ends by saying, moreover, most of the evidence about how Plaintiff's impairments actually affected his daily life came from the testimony of the Plaintiff and other inmates. The jury could properly have rejected this testimony. They did reject it because Mr. Hacker was not believable. By way of history, the first reference to the cataracts occur in the medical records in 2012. At that time, Mr. Hacker was working in the license tag plant, that environment described by my opposing counsel as a dangerous environment. It had punches and saws making license plates. At that time, this is 2012, there's a reference to cataracts in the medical records, but Jason Hacker didn't really have any complaints about his cataracts other than they were there. It didn't become a real issue until the next year, 2013, when he was moved into the fields, outside into the heat, outside where the testimony at the trial from multiple people was that inmates don't like being out there in the heat. Jason Hacker even admitted to that, did not want to be moved out into the fields. When he is moved out into the fields, that's when these cataracts become a, quote, medical emergency. At Angola, an inmate has the ability to declare himself a medical emergency, and an evaluation is done right then. Mr. Hacker was out in the field. He said, I can't see, I'm blind. He was evaluated because of that. And when he was given the evaluation sheet to sign, a plaintiff's exhibit here, the bottom line where it says, offender's signature, he couldn't sign it. He couldn't even scratch out his own signature. It says, can't see. Someone else wrote that in there. So he couldn't sign it. But at the same time period, we have another exhibit. This is a letter from the offender. It's a one-page letter, line perfect. I mean, it is someone who is blind could never do what he did. He said it took him a long time. But you will see that each of the words is perfectly situated atop each of the lines. Let me ask you, what does the statutory language record of such an impairment mean? Yeah. So under the ADA, you... What does the law say it means, actually? Yeah. The law says, and it's not completely clear, they're arguing that the fact that there is a reference to legal blindness in the optometrists' records at Angola amounts to a record of disability. But the law is very clear that you must show that this record of disability still substantially limits a major life activity. What does record of disability mean? Record of disability means a demonstration of some sort of a demonstration of disability. The term record in the statute is not specifically defined. So when he's out in the field during this three-month period... Well, he did have a record of disability. I mean, if you just look at the objective evidence, say he was diagnosed with cataracts and needing surgery, correct? Well, look, that's a great question, Your Honor. The records from Angola show there's a reference, I think, at two separate places to, quote, legal blindness, which, as per the testimony, is Vision 2200 or worse corrected. Now, but what also was explained, we have at Angola, we don't have a medical doctor, we don't have an ophthalmologist, but we do have an optometrist. And they put up that everyone is aware that the eye chart, you know, the big E on the top and the lines under there, and you're asked to read it. And if you say, I can't read that, then the optometrist puts legally blind. But the evidence, when it finally got to the outside hospital where the vision was actually tested, quote, objectively, as explained by the medical doctor, the ophthalmologist, this guy had pretty good vision. So the fact that there's a reference to a cataract or a reference to legally blind or a reference to refer out for a surgical evaluation, that doesn't mean that they meet that prong of the ADA, a record of disability. The jury didn't think it substantially limited a major life function. Mr. Hacker's testimony was not credible in that regard. In addition to the letter, he testified that while he was out in the field at the same time, now bear in mind, this guy is a weightlifter. He's described by his inmate friends as one of the biggest guys in the yard. He testifies that while out in the field, he misjudged a bale of hay and completely tore his pectoralis major muscle clear off the bone. That was his testimony. When the medical director testified, there's no record of that anywhere. Opposing counsel says Mr. Hacker never testified that there was a medical record of this happening, so his credibility wasn't undermined. That completely misses the point. We have a guy who's out in the field, not happy being there, declaring himself a medical emergency because he says he can't see, and at the same time, he completely tore one of the largest muscles we have off the bone and didn't seek medical treatment. It was not believable. Further, the judge permitted them to take a video of Mr. Hacker outside the presence of the jury and show it to them to attempt to demonstrate this injury, which was when it was finally played. You're saying he has no damages as a matter of law? I'm saying that he argued to the jury that because his vision was compromised, he misjudged a bale of hay and had this, but it's completely not credible. His vision was not compromised to where that could happen. After the video was played, in cross-examination, you could see the guy was still muscular. He admitted that he's still pumping iron four times a week. In opening argument, it's argued that he lost the two most important things to him, his music and his exercise, and he's still pumping iron four times a week. It was a credibility determination. And finally, the reference to the tag plant. You know, in the pleadings in this matter, at the trial in this matter, at the post-trial argument, they're trying to argue that his compromised vision led to him losing a piece of his finger in this tag plant because he went from the tag plant into the field for three months and then back into the tag plant. Now, when Jason Hacker actually testified, he explained to the jury that he was working in the tag plant, he was cleaning the machine, and the guy who was in control of shutting the machine on and off did not wait for Jason Hacker to say clear, and he hit a button, and Jason lost a piece of his finger. He admitted it was the other inmate's fault that this happened, but more interestingly, he admitted that he had had the cataract surgery two weeks before this incident and that he had, by his own testimony, had been restored perfect vision in that eye. When I asked him, I said, tell this jury that your vision had nothing to do with this incident, and this is at page 6452 of the record, he said it didn't. My vision had nothing to do with this incident. In appellate counsel's brief to this court, he continues making that argument. Page 7, he says they put him in a dangerous work environment. He lost a piece of his finger. Nonsense. It had nothing to do with his vision at all. With respect to the complaints about statements made in opening statement, there was some discussion. In my opening statement, there was a motion in limine where the judge said you cannot refer to the crimes that he committed to get here. In my opening statement, I said Jason Hacker is serving a life sentence at Angola. There was no objection made to that. The judge supplied this objection later on in the trial. If you look at the record, it was not made. And I argued with him that my statement did not violate his motion in limine. But regardless, in the judge's post-trial ruling, he said, well, defense never put a witness on on that issue. Defense never tried to introduce any evidence, so it's harmless error. And what he further pointed out in footnote six of his opinion is that the plaintiffs themselves put in the entire criminal history of Mr. Jason Hacker, showing multiple murders, burglary, sentencing, his complete record at Angola. They put it in, not me. How was that put in? They moved to admit exhibits. It's filed? It's right in front of the jury. The jury had all of it? The jury had all of it. The precise thing that they complain of here, they put it in front of the jury, not me. Just out of curiosity, what was the – when it was moved in the evidence, it was moved to show what? I mean, what was – This was a big – Establish what? It was a big document case, Your Honor. They put in a bunch of documents at the beginning of the trial, and it was over no objection, and the judge just admitted it all. It went in. So when he was – he testified, right? He did. So he was not asked on direct, and you did not ask on cross anything beyond what you just said about the life sentence? That's correct. That's correct, Your Honor. The other complaint was about mentioning other medical conditions, and the judge's ruling was pretty clear on that. You know, there was – Mr. Hacker had been at Angola for quite a while. There was a bunch of orthopedic treatment years before this which were not discussed at all, and the judge said, you know, you need to focus your attention on the cataracts. But in 2012, when this all started, and the medical testimony supports this, there was a lot going on. This guy was losing weight. Plaintiff attorney himself said it in opening. He was losing weight. There were some sugar issues. They thought he might be diabetic. They thought he might have a diabetic retinopathy. They mentioned a condition, keratotonus, which is an inflammation of the eye. Yeah, I discussed those things because it was part of the differential diagnosis. And, in fact, in the judge's post-trial ruling, he mentions that some of that stuff was part of the differential diagnosis. So, you know, the complaints about the, you know, alleged violations of these motions in limine. There's no prejudicial error, and quite honestly, if you look at the judge's post-verdict opinion in here, I don't even think he thinks that the motion in limine was violated with respect to the other medical treatment. So, you know, the bottom line, the standard of review here, is there any evidence to support the finding? It certainly supports the finding that this guy was not disabled. His vision was far better than what he led on to. And all these injuries that he alleged were related to his vision problems when pushed on cross-examination, he backed away from nearly all of it, and the pectoral muscle incident was quite unbelievable. So we think, you know, there's plenty of evidence to support the jury's finding that there was no disability within the meaning of the ADA. All right. Thank you, Mr. Feinstein. All right. We'll go back to you, Ms. Weiss, if you have rebuttal. Thank you, Your Honor. First, just to mention, to turn Your Honor's attention to a critical place in the record, which is this March 2014 test, which defendants describe as this is sort of a smoking gun in their brief and oral argument that his vision was not as bad. So there are two really significant things about this record. First of all, and this is at 8-440, that this test, first of all, it shows his visual acuity as bad, a little bit worse than 2060 in one eye and 2100 in the other, but not as bad as some of the previous tests. However, there are two ways that you can be legally blind. One is visual acuity, which is your ability to identify things, not have blurred vision, and then there's visual field issues, which is when there are blocks in your physical ability to see. So this very same page that showed that in the opinion of that doctor, his visual acuity was not as bad as it had been in previous incidents, also said that Mr. Hacker could only see by looking over the cataract in his right eye. So Dr. Castle testified very briefly, said there's this one record, this record says that at this point he wasn't legally blind. Now, of course, that's a much higher bar than a visual disability under the ADA, but that is true on visual acuity, but it's not true on visual field issues. This very same page said that he had such significant visual field issues that just to conduct the test he had to look over the cataract in his eye. Second, to briefly discuss this idea that his previous eye tests were turning on self-reports, the record doesn't demonstrate that, and we lay out the evidence chronologically in pages five and six of our reply brief. It's simply not true that all the previous tests were done by optometrists at Angola as opposed to outside hospitals and by outside ophthalmologists. Neither of those distinctions is right. He was seen throughout 2012, 2013, 2014. He was repeatedly referred to as legally blind, including in the response to his ARP by defendants on staff. And defendants, when they were defending against their Eighth Amendment claim, were happy to talk about to the jury all the sophisticated medical testing they did on Mr. Hacker in 2011 and 2012. And we cite in our brief that they got up before the jury and they said, In 2012, we gave Mr. Hacker a corneal topography. This is not just, they literally said, this is not just looking at a letter and saying EBCD. This is really sophisticated medical technology. And then in 2013, their deputy warden for health services said, I've carefully reviewed all of your medical records. I find you to be legally blind. So that would have included the review of the corneal topography. So the outside hospitals, the ophthalmologists, they were referring to him for surgery. There's no evidence in the medical record that anybody suggested that he should not be having surgery. I should have looked at this. Did the jury issue include impairment of one major life function? Yes, Your Honor. Did you object to that? No. Okay. The instructions of the jury were correct on that, yes. Okay. And on the record, did it also include a record of impairment? Yes, Your Honor. Was the reference to impairment of life function also referable to the record of impairment? Yes, Your Honor. Okay. And you didn't object to that? No, no, no. I'm sorry? We did not, no. So even if the statute might otherwise require a record of impairment, the way it was submitted to the jury was a record of impairment and impairment of more than one life function. Oh, no, Your Honor. That's not right. So the ADA, the jury instructions on the definition of disability were presented to the jury correctly in that there were two possible ways. Two possible ways he could be disabled under the ADA. One, having a substantial impairment of major life. I mean, did the jury instruction allow the jury to conclude that even if he had a record of disability, it did not affect a major life function? No, Your Honor. It correctly stated that the substantial impairment would be of the disability in the record. Obviously, the record of disability prong would be entirely redundant. I'll look at the instruction, but you didn't object to whatever it was. No, Your Honor. And to briefly, in as much time as I have left, touch on some of the purported credibility issues. You kind of got a red light. Yes, Your Honor. We encourage you to reverse the district court's failure to grant judgment as a matter of law. Thank you, Your Honors. Thank you, Mr. Blanchfield, for your briefing and your argument. The case will be seated.